JUDGE SCHEINDLIN

MH_compIIOF Doc

Carl E. Person
Attorney for Plaintiff
325 W. 45th Street – Suite 201
New York NY 10036-3803
Telephone:  (212) 307-4444
Facsimile:  (212) 307-0247
carlpers@ix.netcom.com

'07 CIV 5796

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

RECEIVED
JUN 19 2007
U.S.D.C. CASE N.Y.
CASHIERS

MARTIN R. HYDE,

                          Plaintiff,

                       v.

GORDON RAMSAY, a/k/a CHEF GORDON RAMSAY,
UPPER GROUND ENTERPRISES, INC.,
GRANADA AMERICAN,
GRANADA ENTERTAINMENT,
A. SMITH & CO., and
SEVEN NETWORK LIMITED,

                        Defendants.

------------------------------------------------------------------------x

:
:    Index No.
:
:    <u>COMPLAINT</u>
:
:    (Jury Demand)
:
:
:
:
:
:
:
:
:

COUNT I

**[Breach of Oral Contract and Oral Third-Party Beneficiary Contract]**

    Plaintiff **Martin R. Hyde,** by his attorney, as and for his Complaint,

respectfully alleges:

1

### Jurisdiction and Venue

1.    Jurisdiction of this controversy exists under 28 U.S.C. § 1332, with diversity of citizenship between the parties, and the amount in controversy exceeding $75,000.

2.    The Defendants are doing business (and, alternatively, "transacting business") in New York State and in the Southern District of New York, which gives this Court personal jurisdiction over the Defendants, under CPLR Section 302(a)(1, 4).  Also, each of the Defendants has committed tortious acts within New York directed against the Plaintiff, or committed tortious acts outside of New York directed against the Plaintiff (other than defamation), with personal jurisdiction created under New York's long-arm statute, Section 302(a)(2,3).

3.    Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391(b).

### Plaintiff

4.    Plaintiff, **Martin R. Hyde** ("Hyde" or the "Plaintiff") resides in New York, New York, at 1370 St. Nicholas Avenue, New York, New York 10033.

5.    Hyde is a booker of cabaret-theatre shows and private parties, and functions as a general manager or entertainment manager of such activities for a restaurant. Hyde also is a sales person, and uses this sales experience as booker and general manager of shows and private parties.

6.     During April, 2004, Hyde was hired by the owner of a cabaret-theatre restaurant known as "Dillons", located at 245 W. 54th Street, New York, New York 10019 ("Dillons") as its cabaret-theatre general manager.

7.     Dillons is an Indian-American restaurant with separate menus for Indian and American food.

8.     Part of Hyde's activities as general manager of Dillons' cabaret-theatre was to hire, train and supervise bar and serving staff, and to find, screen and book cabaret shows and private parties.  Hyde was not responsible for hiring or firing kitchen staff at Dillons.

9.     Hyde's employment at Dillons ended on April 9, 2007, the day before Defendant Gordon Ramsay and his group completed what Defendants describe as their one-week "makeover" of Dillons.

10.    During this 3-year period with Dillons, Hyde solicited, screened and booked approximately 50 different theatrical-type shows for Dillons (resulting in about 450 performances). A list of Dillons shows and their reviews is found at www.dillonslounge.com/cgi-bin/entertain/review.cgi.

11.    During the past years, Hyde has earned a deserved reputation for being a competent and successful cabaret-theatre and private-party manager in New York and, as to Hyde's prior activities in London, a competent and successful restaurant manager.

### Defendants

12.   Defendant, **Gordon Ramsay** ("Ramsay"), also known as "Chef Gordon Ramsay", is a resident and citizen of England, and upon information and belief, travels to the United States about once per month.

13.   Ramsay is the owner of a restaurant in New York known as "Gordon Ramsay at the London", located at 151 W. 54th Street, New York, New York 10019.

14.   This restaurant is located about 2-1/2 blocks from Dillons.

15.   Ramsay is well-known in the United Kingdom, Australia, United States and in other English-speaking countries for his "Hell's Kitchen" television series in which he enables a group of chefs to compete for desirable chef positions at well-known restaurants, hotels and casinos, as a reality show.

16.   The "concept" for the Hell's Kitchen series is described by Fox Broadcasting as:

> A one-hour unscripted culinary boot camp that features the drama of a group of wannabe Cordon Bleu cooks and aspiring restaurateurs running a top-class restaurant. overseen by world-renowned Head Chef Gordon Ramsay.  [Source. press release issued by Fox, at http://www.thefutoncritic.com/news.aspx?id=20050117fox09]

17.   Defendants are creating in the United States a television reality series apparently entitled "Ramsay's Kitchen Nightmares" (the "Kitchen Nightmare Series"), in which Ramsay is purporting and will purport to give assistance to failing restaurants in real time, as a reality show.

18.   A 5/17/07 article in www.realitytvworld.com  entitled "Fox announces Gordon Ramsay's 'Kitchen Nightmares' will air this fall" stated in part:

> Fox has announced that *Kitchen Nightmares*, a previously announced new reality series that will follow sharp-tongued British *Hell's Kitchen* chef Gordon Ramsay as he travels across America and helps restaurants in crisis, will air as part of the network's Fall 2007 primetime programming schedule.
>
> Each one-hour *Kitchen Nightmares* episode will see Ramsay visit a different struggling American food establishment.  After arriving at the restaurant in crisis, Ramsay will motivate the owners and bully the kitchen's brigade in an attempt to reverse the fortunes of each struggling restaurant in just one week.  Whether he'll save them from their current nightmare or just create a new one will depend on how the establishment's lazy cooks and moody wait staff respond.
>
> \* \* \*
>
> *Kitchen Nightmares* began production in February and is being produced by Granada America, Optomen Television and A. Smith & Co.  Arthur Smith, Pat Llewellyn, Kent Weed, Gerry McKean and Curt Northrup will serve as the show's executive producers.

19.   Ramsay's practice is to obtain written permission from the owner of a failing or unsuccessful restaurant to do a so-called "makeover" of the restaurant, bring in new customers, and turn the restaurant around with scores or even hundreds of changes.

20.   To capture these changes and the evolving makeover, Ramsay places hidden cameras and microphones in numerous strategic places throughout the restaurant (including the basement, hallways, stairways, kitchen, supply rooms, and customer areas) to capture pictures of and comments from managers, owners, customers, employees and others, for inclusion by editing in the final show to be aired on Fox television.

21.   Ramsay has a reputation of being a world-class chef and his observations on what a restaurant should do to improve its business has value and weight to the viewing public, and has enabled Ramsay and the other Defendants to create television shows for which there is an audience.

22.   Unknown to the viewing audience and to the Plaintiff until his April, 2007 encounter with Ramsay, some or all of Ramsay's Kitchen Nightmares shows are fake and the so called "problems" "uncovered" and "solved" by Ramsay are, for the most part, created by Ramsay and his staff for the purpose of making it appear, contrary to fact, that Ramsay is making over and improving the restaurant in a great many ways.

23.   Ramsay and his makeover efforts with Dillon's during April, 2007 were fabricated and a fraud, and Plaintiff was a victim of such activities by Ramsay and the other Defendants.

24.   Plaintiff was aware before getting involved with Ramsay and the other Defendants that Ramsay is physically coercive (about 6' 3" and 220 pounds); a Captain in the British Special Forces (23rd SAS unit); a skilled practitioner of martial arts; and quite capable of defending himself against physical attack. Ramsay has a reputation in Britain for being the, or one of the, most feared persons in Britain. according various reports, including:

> Chef Ramsey [sic] is commonly regarded as the hardest man in Britain since be became the UK`s bare-knuckle champion last year. beating the current gypsy

champion in a twenty two round marathon in a freight container yard in Hull.
[7/30/06 www.the-spine.com/archives/134]

25.   Plaintiff is 150 pounds, with no martial arts or similar experience, and would be unable to defend himself against a physical attack by someone such as Ramsay. What Plaintiff did not know before getting involved with Defendants was that Ramsay was prone to actual physical violence during his shows and unable to control himself physically during the production of shows or deliberately would get out of physical control to create violence and excitement for his shows.

26.   During October, 2004, Ramsay had a shoving match with an aspiring chef during the U.S. shooting of a Hell's Kitchen show, resulting in physical injury to and medical treatment for the aspiring chef. A Scotland-based online report states:

> Ramsay ... is said to have scuffled with the man on set. The American sprained his ankle after he fell to the floor during the incident and was left needing hospital treatment. * * * It is believed the chef ... became embroiled in a shoving match after a contestant roused his notorious temper. ... The incident ... is thought to have been caught on camera. ... A spokeswoman for Ramsay said: "One cast member did hurt his ankle on set and was taken to hospital, where it was diagnosed as a sprain. ... [Source: http://news.scotsman.com/topics.cfm?tid=789&id=1209732004]

26A.   During 2007, Ramsay has admitted that he fabricated facts to falsely place blame on a subordinate chef seeking to become Ramsay's successor, as follows:

> ... Ramsay admitted stealing the reservations book from his Aubergine restaurant in 1998 and blaming the theft on Marco Pierre White to prevent his being appointed as chef in Ramsay's place.[28] [Source: http://en.wikipedia.org/wiki/Gordon_Ramsay#Football]

7

27.   Defendant, **Upper Ground Enterprises, Inc.** ("Upper Ground"), upon information and belief, is a Delaware or California corporation, with its principal place of business at 15303 Ventura Boulevard – Building C, Suite 800, Sherman Oaks, California 91403.

28.   Upper Ground is one of various producers of the Kitchen Nightmares Series in the United States and one of the producers of a series of reality shows known as "Hell's Kitchen" broadcast in the United States and elsewhere by the Fox Broadcasting network.

29.   Ramsay is the star performer for the Hell's Kitchen and Kitchen Nightmares shows, and upon information and belief is under contract with Upper Ground and/or other producers to star in these shows for Upper Ground and/or other producers.  Upon information and belief, Ramsay is paid $1,000,000 per show (for his performance as star of the show).

30.   Defendant, **A. Smith & Company** ("Smith"), upon information and belief, is a producer with Upper Ground and other producers of the Hell's Kitchen and Kitchen Nightmares series.  Arthur Smith, Kent Weed, Curt Northrup and Paul Jackson serve as executive producers of Hell's Kitchen and/or Kitchen Nightmares for Smith and Granada Entertainment.

31. Smith has its principal place of business at 9911 West Pico Boulevard – Suite 250, Los Angeles, California 90035.

32. Defendant, Granada America ("Granada"), in addition to Upper Ground and Smith, is a producer of the Hell's Kitchen and Kitchen Nightmares Series in the United States.

33. Granada has its principal place of business in Sherman Oaks, California, at 15303 Ventura Boulevard, Building C, Suite 800, Sherman Oaks, California 91403.

34. Granada has an office in New York at 609 Greenwich Street – 9th Floor, New York, New York 10014.

35. Upon information and belief, Defendant, **Granada Entertainment** ("Entertainment") is a co-producer of the Hell's Kitchen and Ramsay Kitchen Nightmares Series in the United States, together with co-producers Upper Ground, Granada and Smith.

36. Entertainment has its principal place of business in Australia, with an office in Sherman Oaks, California, at 15303 Ventura Boulevard, Building C, Suite 800, Sherman Oaks, California 91403.

37. Upon information and belief, Entertainment has an office with Granada in New York at 609 Greenwich Street – 9th Floor, New York, New York 10014.

38.   Defendant, Seven Network Limited ("Seven Network"), has its principal place of business at 38-42 Pirrama Road, Pyrmont, NSW 2009 Australia.

39.   Seven Network is an owner, financier and publisher of the Kitchen Nightmare Series and, upon information and belief, is aware that Ramsay and the other Defendants are fabricating parts of each Show, and that this is being done at the direction of Seven Network, Optomen and Fox.

40.   Optomen Television Ltd. ("Optomen"), located in London, is a producer of the United Kingdom hit show "Kitchen Nightmares" with Chef Gordon Ramsay.  At www.optomen.com/current1.html, Optomen describes this U.K. series in part at follows:

> We're looking for restaurants, hotels, bistros or pubs that are struggling to succeed, or just need help taking their business to the next level.

41.   Upon information and belief, each of the Defendants (hereinafter, the "Defendants") together with Optomen, Fox Broadcasting Co., Inc. ("Fox"), Gerry McKean, Arthur Smith, Kent Weed, Curt Northrup and Paul Jackson, is a joint venturer and partner of a group (hereinafter, the "KM Joint Venture" or the "KM Joint Venturers") for the purpose of producing Kitchen Nightmares in the United States and distributing such series to most or all English-speaking countries through Fox.

42.   Upon information and belief, each of the KM Joint Venturers is an agent of and speaks for each of the other KM Joint Venturers and the KM Joint Venturer concerning matters relating to the KM Joint Venture and the Kitchen Nightmares Series, and that each of the KM Joint Venturers has ratified all of the acts of the other KM Joint Venturers.

## Summary

43.   Defendants, producers of restaurant- and kitchen-related television reality shows in the United Kingdom, Australia, United States and other English-speaking countries, decided to break into the United States television market with a United States series based on the UK series "Kitchen Nightmares".

44.   The United States version, tentatively entitled "Ramsay's Kitchen Nightmares", is scheduled to air on the Fox  network starting in September, 2007.

45.   Upon information and belief, the Defendants and other members of the KN Joint Venture decided that the fate of the series could not depend on actual conditions and events uncovered during shooting of the reality show, and that exciting parts of the show had to be artificially created and staged and falsely represented to participants, advertisers and millions of audience viewers as unstaged "reality" scenes.

46.   Defendants falsely lured the Plaintiff and Dillons into participating in the production of one of the Ramsay Kitchen Nightmare shows (the "Dillons

Show"), and created a variety of false, defamatory scenes designed to destroy the job and reputation of the Plaintiff, and inadvertently (as a consequence) severely injure the business and reputation of Dillons.

47.   Examples of falsely created, staged scenes include: (i) stating that the Indian food was not fresh, supposedly justifying Ramsay ordering the Plaintiff to close Dillons for the rest of the day; (ii) placing the blame for "unsatisfactory restaurant conditions" and the hiring of "incompetent" kitchen staff by the Plaintiff; (iii) immediately increasing the number of customers for Dillons; (iv) Ramsay being induced by his own staff to sit down on an unstable chair (created by the staff) giving the appearance that Dillons was using defective furniture; and (v) blaming and firing Plaintiff for conditions at Dillons.

48.   Upon information and belief, the truth is that:

(i) Dillons was an Indian restaurant and the Indian food was fresh, and Ramsay was creating an excuse to close Dillons for the rest of the day and to falsely blame the Plaintiff, simply for the wholly unjustified dramatic effect;

(ii) the Plaintiff never had anything to do with the hiring or supervision of any kitchen staff at Dillons; the Head Chef, 2nd Chef and Tandoori Chef had been fired by Dillons' owner 9 days before Ramsay's arrival;

(ii) the vast majority (about 90%) of the "customers" were actors hired by Defendants (and about 10-12 were friends of Ramsay) to pretend they were

customers unconnected with the production and to falsify that Ramsay was building Dillons business with legitimate customers; and

(iii) Plaintiff was not in charge of hiring, firing or managing any of the Dillons kitchen personnel, and this was known to Ramsay at all times; the premature firing of Dillons' chefs by Dillons owner required Ramsay to falsely blame someone else, who was still at Dillons and could be blamed on camera; and Ramsay selected the Plaintiff for such false blame.

**Plaintiff and Dillons Get Involved
with Ramsay's Kitchen Nightmares**

49.   Dillons is located in the Theatre District of New York, on 54th Street, between Broadway and 8th Avenue.

50.   In spite of its favorable location, Dillons was not running profitably during the 3-year period ending in April, 2007 or, upon information and belief, thereafter.  The financial condition in mid-June, 2007 (2 months after the Ramsay "makeover") is worse than it has been at any time during the past 3-1/2 years.  Upon information and belief, Ramsay's plans to pay for additional fake customers to go into Dillons shortly before the scheduled September, 2007 broadcast of the Dillons Show, capture this new business on camera, add some of this new footage to the Dillons Show, and then falsely demonstrate to the viewing public that Ramsay's makeover of Dillons was successful, when in fact Dillons is anything but.

51.   Plaintiff heard about the UK Kitchen Nightmares show and that a United States production of a similar show, also with Chef Ramsay, was looking for restaurants in New York, Los Angeles and other U.S. cities to apply to be featured in individual shows for the planned series.

52.   Defendants advertised that struggling restaurants would benefit from the enormous nationwide publicity they would receive, if selected, which would create a near-instant increase in customers and an immediate profitability.

53.   Also, Defendants advertised that the activities of Ramsay would identify various problems the restaurant was having and for Ramsay with his restaurant expertise to suggest ways in which the problems could be cured, to enable the restaurant to become successful and profitable, or very profitable.

54.   The Plaintiff was aware of this advertising by Defendants and, with the permission of Dillons, applied to have Dillons accepted as one of the participating restaurants to be featured in the Ramsay Kitchen Nightmares Series.

55.   The application was submitted by Plaintiff during January, 2007, and for the next 2-1/2 months (through March, 2007), Plaintiff was constantly communicating with Ramsay's staff and Upper Ground urging them to accept the application.

56.   Finally, on Thursday, March 29, 2007, Ramsay's staff called Plaintiff and told him that Defendants would use the Dillons restaurant if Dillons' owner

signed some papers (which Plaintiff assured Ramsay's staff the owner would do); and that Ramsay and his production staff would arrive to start the production on Thursday, April 5, 2007, 1 week later.

57.   Ramsay's production staff arrived (without Ramsay) at Dillons on April 3, 2007, and they required the owner of Dillons and/or the Plaintiff to sign a written agreement and/or release. A copy of the document entitled "KITCHEN NIGHTMARES - PERSONAL RELEASE" (without any signatures) is annexed as **Exhibit A** hereto. Several months earlier, when making application to be considered as a candidate for the show, Plaintiff, on behalf of  applicant Dillons, and/or the owner of Dillons was required to sign a 1-page release form (**Exhibit B** hereto, also without signatures).

58.   The written agreement and release signed by Plaintiff and/or the owner of Dillons are void and unenforceable as against public policy and by reason of Defendants' fraudulent inducement of Plaintiff and the owner of Dillons to execute such written agreement and release. The facts upon which these allegations are based are set forth in Count X below, which allegations are incorporated by reference hereby, as if more fully set forth herein.

59.   Defendants entered into an oral agreement with Plaintiff and with the owner of Dillons on or April 3, 2007 (the "Two Oral Agreements").

60.   The two Oral Agreements provided that:

A.    Dillons was to provide total access to the Defendants for a period of one week, in which the Defendants would install about 60 cameras and microphones to record events in about 60 places simultaneously, as events occurred;

B.    Plaintiff, other management personnel and employees of Dillons would fully cooperate with the Defendants during the production period;

C.    Ramsay would use his skill, experience and best efforts to identify the most practical or appropriate ways for Dillons to improve its restaurant business;

D.    Ramsay and the other Defendants were authorized to and would make internal or external changes of a physical nature to effect a promised makeover of the restaurant;

E.    Ramsay and the other Defendants promised to use their restaurant marketing expertise to bring in restaurant customers for Dillons during the 1-week period that the show was to be produced at Dillons;

F.    A show would be edited from the takes of the numerous cameras and microphones throughout Dillons and action shots with Ramsay and such show would be broadcast showing how Ramsay was able to save Dillons and make it profitable;

G.    No one can or will be fired by Ramsay or his production staff; the worst that can happen is that Ramsay could recommend to Dillons' owner that someone be fired;

H.   Impliedly, Defendants would not falsify or create non-existent events to make Plaintiff, Dillons, or any of Dillons' other managers or employees appear (falsely) to be incompetent, foolish or unprofessional; and

I.   Impliedly, that the cabaret-theatre part of Dillons business would not be terminated by Ramsay.

61.   Plaintiff was a third-party beneficiary of the Oral Agreement between Defendants and Dillons.  Alternatively, there was a single Oral Agreement with Defendants in which both Dillons and the Plaintiff were parties.

62.   On Thursday, March 29, 2007, the day before the production crew arrived, the owner of Dillons fired the 3 Indian chefs (Head Chef, 2nd Chef and the Tandoori Chef), leaving a Mexican chef to run Dillons' Indian-American restaurant.

**Commencement of the Production of the Dillons Show on April 5, 2007**

63.   Starting on Thursday, April 5, 2007, Ramsay's production group came into Dillons with several truckloads of video cameras, lights, sound equipment, furniture, supplies and other items.

64.   Ramsay and his employees started making various changes to Dillons, such as terminating the cabaret-theatre operations, having Dillons operate without any regular or knowledgeable chefs. The owner of Dillons cooperated with

17

Ramsay by doing whatever Ramsay or his production personnel requested, as was required by Dillons' agreement with them.

65.    Ramsay and his production personnel had promised that his makeover of Dillons would produce immediate customers, and to appear to fulfill this promise Ramsay's personnel arranged through a temporary employment agency or similar service to send temporary paid employees to Dillons to masquerade as new Dillon customers.  Upon information and belief, these persons were hired to be actors for the production, were paid $75 each, and were required to sign releases.

66.    Upon information and belief, these apparent customers had been hired by Defendants to play the role of customers, and Dillons and the Plaintiff were not told that this increased number of customers was fabricated.

67.    On Saturday, April 7, 2007, at about 6 or 7 p.m., Ramsay claimed he found, in a Dillons refrigerator, rotten hamburger meat available for use in preparing American-type meals at Dillons.  Ramsay ordered the Plaintiff to close Dillons and throw out the 3 tables of customers (about 6-7 persons), which Plaintiff did. Ramsay screamed to the waitresses (which could be overheard by the exiting customers) "Tell the customers to consider themselves lucky. I have just saved their lives.  If they had eaten the food the General Manager [referring to the Plaintiff] has passed, they would probably have died."  This statement about Plaintiff was false and defamatory as to the Plaintiff.

68.   Immediately after this closing, the waitresses were understandably upset, because they believed they no longer had a job. Ramsay's purpose, in part, in closing Dillons was to get the waitresses to blame the Plaintiff for their apparent loss of employment.  The production crew ran after them (with cameras in hand) and encouraged them to place the blame for the loss of their jobs on the Plaintiff, which they did, even though the Plaintiff was not responsible for the condition of the kitchen or the food therein.  The owner of Dillons was in charge of hiring and firing all kitchen personnel.

69.   Unknown to Dillons or the Plaintiff, and upon information and belief, a substantial part of the production was scripted and was not a reality show. Upon information and belief, Ramsay and one or more of his producers and production employees had planned prior to commencement of the Dillons' production to falsely blame someone for various conditions fabricated by Ramsay and/or his staff, such as (1) discovery of rotten meat; (2) discovery of rat droppings; (3) choosing a wobbly chair and having Ramsay sit down on the chair, followed by a Ramsay tirade at the person (such as Plaintiff) to be falsely blamed for use of defective furniture. The purpose of these and other fabrications by Ramsay was to be able to (wrongfully) abuse and then fire one or more Dillons employees on camera for allegedly allowing or creating the fabricated condition.

**"Blaming" and "Firing" the Plaintiff**

70.   Ramsay and the other Defendants from the start were fully aware that the Plaintiff was never involved in managing Dillons' kitchen, and that the kitchen had no head chef on the first day of the 1-week production.

71.   The Dillons head chef (a woman known as "Rimi") had been fired by Dillons' owner on Thursday, March 29, 2007, and Ramsay's plan to blame and fire the Dillons' head chef for conditions created by Ramsay and his staff was inadvertently disrupted.  Ramsay had to keep his production going by finding someone else to blame on camera for the fabricated and any legitimate adverse conditions, even though the person to be selected would be entirely blameless as to the fabricated conditions.

72.   On Tuesday, April 3, 2007, the Ramsay production staff asked the Plaintiff to try to rehire Rimi, which Plaintiff tried to do, on April 3, 2007, but Rimi declined to be rehired.

73.   Plaintiff saw the foregoing and other abusive, intolerable practices of Ramsay and his production staff (although at the time was generally unaware that these events were being fabricated by Ramsay and his staff), and decided not to suffer any more undeserved abuse and blame for conditions at Dillons.

74.   On Sunday, April 8, 2007, on the sidewalk in front of Dillons, Ramsay grabbed Plaintiff's cell telephone, substituted a different cell phone without

Plaintiff's knowledge, then threw the substitute phone onto the sidewalk, then directed Plaintiff to retrieve the phone. This forced Plaintiff to get on his hands and knees on the sidewalk to look for what he thought was Plaintiff's phone, without success. Meanwhile, Ramsay dialed Plaintiff's cell phone number, in front of various production staff and Dillons employees, and left the following message for Plaintiff: "Hello, General Manager, Gordon here. Can you get your arse back to the restaurant and attempt to do your job please, now, quickly. Thank you General Manager – Fake!" in a sarcastic tone. In the background, you can hear one of the producers feeding the line "Fake" to Ramsay.

74A. All of this was being videotaped, to be edited with Plaintiff crawling around on the sidewalk in front of the Dillons employees, causing Plaintiff to be professionally humiliated and degraded, without justification, in front of the Dillons staff and, upon information and belief, the viewing audience for the Dillons Show.

75. On Monday, April 9, 2007, while the production was still in progress, the Plaintiff was told by a Dillons employee that Ramsay told the Dillons' owner to fire the Plaintiff, otherwise Ramsay would cease all assistance and stop the production.

76. Because of this reason alone (and not wanting the stigma of being fired), the Plaintiff told Dillons' owner that Plaintiff would finish out the day and not come back to Dillons – that this was Plaintiff's last day at Dillons.

77.    At the time, the Plaintiff believed that he had quit instead of being terminated, but in actuality the Plaintiff had been fired by the actions of Ramsay and Dillons' owner. They had deliberately created intolerable working conditions for the Plaintiff and the termination of his employment was a constructive firing as a result.

78.    By quitting his job when he did, the Plaintiff unknowingly created a major problem for Ramsay and his production personnel.  Plaintiff had been targeted from day one for blame and termination, but by quitting prematurely, Ramsay lost the planned dramatic effect. They no longer had anyone working at Dillons to falsely blame for the conditions fabricated by Ramsay and staff.

79.    Upper Ground producers personally called the Plaintiff by telephone on April 10, 2007 and asked the Plaintiff to come in for what would be a "final interview", for the sake of the production.  By now, Plaintiff was aware of Defendants' falsification and subterfuge, and clearly understood that Ramsay intended to edit out Plaintiff's resignation and create footage in which Ramsay was firing Plaintiff on camera and getting Plaintiff's reaction to being fired and branded as a "fake", and get his reaction on camera to being fired.  Plaintiff believed he might have a chance to set the record straight, and went back to Dillons as requested.

80.    Upon information and belief, the final version of the Dillons show, as part of the Ramsay Kitchen Nightmares Series (hereinafter, the "Dillons Show"), is

going to falsely blame Plaintiff for the failure of Dillons, and end with Ramsay falsely curing Dillons' "problem" by fabricating the firing of the Plaintiff.

81.   On the date of the filing of this Complaint, Dillons is at its absolute worst financial condition for the period between April 2004 and the date of filing of this Complaint.  The reasons for the failure of Dillons to achieve any benefit at all from the April, 2007 "makeover" by Ramsay and his production groups are:

A.   Ramsay caused Plaintiff to be fired, which ended Dillons' cabaret-theatre and private-party business, and caused Dillons to lose the revenues it had been obtaining from such business;

B.   Ramsay, in what was a shock to everyone at Dillons, caused the outdoor moving-light marquee to be torn down, which deprived Dillons of its theatrical look in the world's greatest theatrical district, and made it more difficult to market Dillons and its services;  The marquee had cost Dillons $40,000 and costly licensing proceedings to install only several months before;

C.   Ramsay failed to replace the customers and revenues that were turned away by terminating the cabaret-theatre and private-party business;

D.   Ramsay failed to provide any advertising or marketing system by which new customers could be obtained by Dillons; and

E.   Ramsay failed to leave Dillons, at the end of the one-week production period, with a restaurant that anyone wanted to patronize.

82.   The Ramsay show involving Dillons and Plaintiff was staged and scripted to appear to be a reality show, with events being filmed as they were occurring. The show is a fake, and is a prime example of Fake TV, with viewers, advertisers, and participating restaurants and their personnel being willfully deceived by Ramsay and the other Defendants into believing that Ramsay is curing restaurant problems when in fact he is injuring and destroying some of the participating restaurants, including Dillons, and injuring the professional, trade and business reputations and money-earning capacity of various persons associated with the restaurants, including the Plaintiff.

82A.  All Ramsay ever provided to Dillons was a "paid for" quick fix of a few "actor" customers.

82B.  On Saturday, April 7, 2007, throughout the night, Ramsay allegedly had Dillons cleaned by an outside group of 8 cleaning personnel, then allegedly fumigated by an outside staff of 3 fumigators (wearing gas masks), all captured on Ramsay's video cameras. The alleged purpose was to bring Dillons up to Ramsay's hygienic standards. These standards apparently were lower than NYC standards because on April 19, 2007, the NYC Department of Health closed Dillons for alleged unsanitary conditions, raising an issue of what Ramsay's cleaners and fumigators had actually done.

83.   Ramsay and his co-Defendants are causing unexpected and unjustified injury to some of the participants such as Plaintiff and Dillons, and unjustly enriching themselves at the expense of Plaintiff, Dillons and others.

84.   Ramsay's Kitchen Nighmares is a fraud and is Fraud TV at its worst.

**Actual and Threatened Injury to Plaintiff**

85.   Plaintiff has been injured by the activities of the Defendants including the loss of his job with Dillons, including the loss of income he would have been making as booker and cabaret-theatre manager of Dillons, and the destruction of one of the limited number of cabaret-theatre venues in New York City.

86.   Also, Plaintiff is being threatened with irreparable injury (through airing of the produced Dillons Show) with professionally and personally destructive libel.  This would be by falsely depicting that Plaintiff is incompetent as a manager of all or part of a cabaret-theatre restaurant business, and that he is dishonest, lazy and a fake.

87.   If the fabricated show is broadcast in New York City and London as threatened by Ramsay and the other Defendants, Plaintiff will be irreparably damaged and be unable to resume his career in managing cabaret-theatre or managing any other parts of a restaurant in New York or London.

88.   Plaintiff is entitled to a preliminary and permanent injunction prohibiting the airing of the Ramsay Kitchen Nightmares Series relating to Dillons

and Plaintiff for a 100-mile radius from Fox's broadcast studios in New York, New York and London, England.

89.   Plaintiff is entitled to actual damages in the amount of $1,000,000 or more, which amount will be ascertained and proven with certainty at the time of trial.

90.   Plaintiff is entitled to costs and attorney's fees.

91.   Ramsay and the other Defendants have acted willfully, and maliciously, with near criminal indifference to their civil obligations under New York law, for the purpose of injuring the Plaintiff, Dillons, other Dillons' employees, other restaurants and their owners and employees, and to willfully deceive many tens of millions of anticipated viewers of Defendants' Ramsay's Kitchen Nightmares Series in the United States, Australia and other English-speaking countries, and to defraud advertisers.

92.   The Plaintiff is entitled to punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## COUNT II

### [Unjust Enrichment]

93.   Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-92 above, and further allege that the activities of Defendants are unjustly enriching each of the Defendants at the expense of the Plaintiff, Dillon and others.

94.   By reason of their alleged activities, Defendants have been unjustly enriched through production moneys received and to be received from one or more of the Defendants and from non-defendants to pay for production costs, overhead expenses and profit. These moneys were and are to be paid for a reality show having a estimated ratings level that only can be achieved by injuring or destroying the reputation and business of Plaintiff, Dillons and other unwitting participants in the falsified show being produced by Defendants.

95.   Upon information and belief, the monetary value added to an honest, non-fabricated reality production of the Dillons Show substantially exceeds the dollar amount of provable injury caused and to be caused by the fabricated show to Dillons, Plaintiff and others (including any theoretical value estimated for the irreparable injuries to such persons).

96.   Defendants are in the process of deceiving many tens of millions (perhaps hundreds of millions of television viewers) and many advertisers, and future participants in the Ramsay Kitchen Nightmares Series productions, as to which Defendants anticipate making hundreds of millions of dollars, upon information and belief.

97.   On the other hand, Dillons' business has been ruined; Plaintiff has been terminated, constructively, and is currently out of a job, and is being threatened

with destruction of any restaurant-related or other employment he may obtain before airing of the Dillons Show by Defendants.

98.   Equity and good conscience militate against permitting Defendants to retain the dollar amount (a) by which Plaintiff has been and is going to be injured through Defendants' alleged activities; and (b) representing an estimate of the cost to the Plaintiff of the irreparable damages he is to suffer by reason of the broadcast of the Dillons Show defaming the Plaintiff as alleged above.

99.   By reason of Defendant's activities as alleged, the Plaintiff has suffered, and will suffer upon broadcasting of the Dillons Show, the damages described in ¶¶ 85-88 above.

100.   The Plaintiff is entitled to damages as described in ¶ 89 above.

101.   The Plaintiff is entitled to an award of costs and attorneys' fees.

102.   The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## COUNT III

### [Inducing Dillons to Breach its Contract with Plaintiff]

103. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-102 above, and further alleges that the activities of Defendants are a wrongful inducing by Defendants of Dillon to breach its contract with the Plaintiff.

104. Dillon and Plaintiff had entered into an oral agreement during April, 2004 pursuant to which Plaintiff agreed to run and manage Dillons' existing cabaret-theatre. Plaintiff's remuneration was set at $500 per week. The contract was terminable at will by either party, with 2-weeks' notice.

105. Omitted.

106. Defendants' activities in fabricating conditions at Dillons during the production period, and further activities of placing blame on Plaintiff and others, caused Plaintiff to quit his job at Dillons, on April 9, 2007, to avoid further abuse.

107. The fabrication activities of Defendants were unlawful, and were in fact a constructive firing of the Plaintiff by Defendants, on behalf of Dillons, in breach of Plaintiff's oral agreement with Dillons.

108. By reason of the Defendants' activities as alleged, the Plaintiff has suffered, and will suffer upon broadcasting of the Dillons Show, the damages described in ¶¶ 85-88 above.

109. The Plaintiff is entitled to damages as described in ¶ 89 above.

110. The Plaintiff is entitled to an award of costs and attorneys' fees.

111. The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## COUNT IV

### [Unlawful Interference with Plaintiff's
### Advantageous Business Relationship with Dillons]

112.  Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-111 above, and further alleges that the activities of Defendants are an unlawful interference by Defendants with Plaintiff's advantageous business relationship with Dillons.

113.  By reason of Defendant's activities as alleged, the Plaintiff has suffered, and will suffer upon broadcasting of the Dillons Show, the damages described in ¶¶ 85-88 above.

114.  The Plaintiff is entitled to damages as described in ¶ 89 above.

115.  The Plaintiff is entitled to an award of costs and attorneys' fees.

116.  The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## COUNT V

### [Assault by Ramsay; Ratified by Other Defendants]

117.  Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-116 above, and further alleges that the activities of Defendants are an unlawful assault upon Plaintiff by Ramsay, which assault was ratified and adopted by the other Defendants as their respective acts.

118. On April 8, 2007, while producing the Dillons Show, Ramsay put his face several inches from one of Plaintiff's ears and screamed into the Plaintiff's face, "When I go for a shit, you are the little bit of shit I just can't get out.". Ramsay was so hysterically angry and out of control, that his behavior was menacing to the Plaintiff. Plaintiff became afraid, and reasonably perceived an immediate threat of harmful physical attack by Ramsay at that moment.

119. Plaintiff had learned prior to April, 2007 that Ramsay was a martial arts expert and had served in the British Special Forces, and had the skill if not experience in crippling or killing victims who were unprepared for or defenseless against any such assault. Plaintiff was aware that he could not defend himself against any injurious assault against him by Ramsay.

120. Up to the screaming event on April 8, 2007, Plaintiff did not believe that there was any threat of physical violence to be directed against Plaintiff or any other Dillons employee. Plaintiff reasonably believed that Ramsay did not commit assault or battery upon participants in Ramsay's various television shows and series.

121. While this was taking place, the Plaintiff reasonably believed that Ramsay, immediately thereafter, was going to strike the Plaintiff with an intent to physically injure the Plaintiff.

122. The above-described threatened physical contact with the Plaintiff was an unlawful assault upon Plaintiff, and was harmful and offensive, and the

Plaintiff was afraid at that moment that Ramsay immediately thereafter was going to commit unlawful battery upon Plaintiff's person.

123.  The above-described assault was ratified and adopted by the other Defendants as their respective acts.

124.  By reason of Defendant's activities as alleged, the Plaintiff has suffered damages of $250,000 or more, to be determined by the trier of fact.

125.  The Plaintiff is entitled to an award of costs and attorneys' fees.

126.  The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $750,000 or more, to be determined by the trier of fact.

## COUNT VI
**[Violation of § 349 of the New York General Business Law – Deceptive Acts and Practices in Conduct of Defendants' Business in New York]**

127.  Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-126 above, and further alleges that the activities of Defendants constitute a violation of § 349 of the New York General Business Law as deceptive acts and practices in the conduct of Defendants' business in New York which have caused injury to the Plaintiff, Dillons and others (such as competing reality shows not falsifying their productions).

128.  Plaintiff was induced by a casting notice and show description (Exhibit D hereto, hereinafter, the "Advertisement") to apply, on behalf of Dillons

and himself, to participate in and for Dillons to be the subject of a show in the new United States Ramsay Kitchen Nightmares Series. Upon information and belief, the Advertisement was prepared and/or approved by the Defendants. The Advertisement contained a link to an application form of the Defendants, which Plaintiff downloaded, completed and sent in to Defendants as per the instructions therein.

129. The industry's understanding of the yet to be broadcast Ramsay Kitchen Nightmares Series, obtained from a release issued by Defendants during April, 2007, is set forth at **Exhibit C** hereto, an article entitled "Ready for Your Closeup?"

130. Defendants successfully hid from the industry media the plans to falsify their productions, and their plans to illegally injure and/or destroy some of the participating restaurants and reputations, and the reputations of owners, managers and employees of the participating restaurants, for the purpose of gaining valuable but undeserved ratings for their Ramsay Kitchen Nightmares Series.

131. Plaintiff, on behalf of himself and Dillons, responded to Defendants' advertising to participate in the series, and would not have done so if Plaintiff or Dillons had known that Defendants planned to script the production with falsified events created by Defendants to defame and injure Plaintiff and to defame, injure and destroy the business of Dillons.

132. These activities of Defendants were deceptive acts and practices in violation of § 349 of the New York General Business Law.

133. The above-described activities were ratified and adopted as the activities of each of the Defendants.

134. By reason of Defendant's activities as alleged, the Plaintiff has suffered damages in an amount to be determined by the trier of fact.

135. The Plaintiff is entitled to an award of attorneys' fees.

136. The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## COUNT VII
### [Violations of §§ 350 and 350-e of the New York General Business Law – False Advertising; Bait and Switch Advertising]

137. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-136 above, and further alleges that the activities of Defendants constitute violations of §§ 350 and 350-e of the New York General Business Law as false advertising and bait and switch advertising, which have caused injury to the Plaintiff, Dillons and others.

138. Plaintiff was induced by the advertising of the Defendants to apply, on behalf of Dillons and himself, to participate and be the subject of a show in the

new United States Ramsay Kitchen Nightmares Series.  The substance of the advertising is set forth in ¶ 40 above and in Exhibit D below.

139.  The industry's understanding of the yet to be broadcast Ramsay Kitchen Nightmares Series, obtained from a release issued by Defendants during April, 2007, is set forth at **Exhibit C** hereto, an article entitled "Ready for Your Closeup?"

140.  Defendants' successfully hid from the industry media the plans to falsify their productions, and their plans to turn the promised show from a constructive one for Dillons and Plaintiff into one that would unjustifiably and illegally destroy Dillons' business and reputations, and injure or destroy Plaintiff's income, reputation and future prospects for earning a living.

141.  Plaintiff, on behalf of himself and Dillons, responded to Defendants' advertising to participate in the series, and would not have done so if Plaintiff or Dillons had known that Defendants planned to script the production with falsified events created by Defendants to defame and injure Plaintiff and to defame, injure and destroy the business of Dillons.

142.  These activities of Defendants were deceptive acts and practices in violation of § §§ 350 and 350-e of the New York General Business Law.

143.  The above-described activities were ratified and adopted as the activities of each of the Defendants.

144.  By reason of Defendant's activities as alleged, the Plaintiff has suffered damages in an amount to be determined by the trier of fact.

145.  The Plaintiff is entitled to an award of treble damages under § 350-e of the New York General Business Law (up to $1,000).

146.  The Plaintiff is entitled, under Section 350-e of the New York General Business Law, to an injunction prohibiting Defendants from broadcasting the Dillons Show.

147.  The Plaintiff is entitled to an award of reasonable attorneys' fees (under Section 350-e).

148.  The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## COUNT VIII
### [Libel and Slander of the Plaintiff]

149.  Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-148 above, and further alleges that the activities of Defendants constitute actionable libel and slander of him by each of the Defendants.

**Slander Per Se**

150.  During the 1-week period of on-site production of the Dillons Show at the Dillons premises, Ramsay made the following defamatory statements about

Plaintiff (the "Defamatory Statements") in the presence of other Dillon employees, managers, owners, and members of Defendants' production staff, which upon information and belief Defendants are including in the Dillons Show to be broadcast during September, 2007:

    A.  Plaintiff is and was "dishonest" in his employment at Dillons;

    B.  Plaintiff is and was "incompetent" in performing his job at Dillons;

    C.  Plaintiff is and was "lazy" in the performance of his duties at Dillons;

    D.  Plaintiff "threatened to kill his customers" at Dillons by allowing them to be served rotten food , and that Ramsay "just saved their lives" by throwing the customers out of the restaurant before they could eat the rotten food;

    E.  Plaintiff is a "bloody fucking fake" in his job as a manager of Dillons;

    F.  Plaintiff was "taking that poor man's money and blowing smoke up his ass"; and

    G.  Plaintiff was "fired" from his job at Dillons for "incompetence" and/or "dishonesty".

    151.  Each of the Defamatory Statements was false.

    152.  Each of the Defamatory Statements was injurious to the Plaintiff in his trade, business or profession and as to his character.

    153.  Each of the Defamatory Statements was per se libelous.

154.  Ramsay made each of the Defamatory Statements knowing that the statement was false, and injurious to the Plaintiff.

155.  Ramsay made each of the Defamatory Statements with the intention of causing injury to the Plaintiff upon broadcast of such statements, which upon information and belief was deemed necessary to Ramsay to create high ratings for the Dillons Show and the Ramsay Kitchen Nightmares Series of which it was to be a part.  Ramsay had a high degree of awareness of the falsity or probable falsity of each of the Defamatory Statement and entertained serious doubts about the truth of each of the Defamatory Statements.

156.  The activities of Ramsay and the other Defendants severely abused any common interest and privilege that may have existed between Plaintiff and Ramsay to have a flow of information between them to create a better Dillons.

157.  The above-described activities of Ramsay were ratified and adopted as the activities of each of the other Defendants.

158.  Each of the spoken Defamatory Statements was slander per se of the Plaintiff by Ramsay and the other Defendants.

**Slander**

159.  Each of the spoken Defamatory Statements was slander of the Plaintiff and the Plaintiff was injured by such Defamatory Statement by having been constructively fired by Dillons on April 9, 2007.

**Libel**

160. Upon information and belief, each of the Defamatory Statements was recorded on one or more television cameras and played back to various editors, production assistants, other employees and managers of each of the Defendants prior to the initial broadcast of the Dillons Show during September, 2007. Such playback made the Defamatory Statements libelous and per se libelous as to the Plaintiff.

160A. Broadcast of the Dillons Show in the New York and London markets with any of the Defamatory Statements would be libelous and per se libelous as to the Plaintiff.

161. Defendants are threatening to broadcast the Dillons Show during September, 2007, as one of the first shows to be broadcast for the Ramsay Kitchen Nightmares Series.

**Damages**

162. By reason of Defendant's activities as alleged, both as to slander per se and libel, the Plaintiff has suffered damages in an amount to be determined by the trier of fact.

163. The Plaintiff is entitled to an award of attorneys' fees.

164. Ramsay and the other Defendants have acted willfully, and maliciously, with near criminal indifference to their civil obligations under New York law, for the purpose of injuring the Plaintiff, Dillons, other Dillons' employees, and to willfully deceive many tens of millions of anticipated viewers of Defendants'

Ramsay's Kitchen Nightmares Series in the United States, Australia and other English-speaking countries.

165. The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

166. The Plaintiff is entitled to a preliminary and permanent injunction to prohibit broadcast of each or any of the Defamatory Statements in the Dillons Show as to a 100-mile radius around the Fox broadcast facilities in New York, New York and London, England.

## COUNT IX
### [Breach of Implied Covenant of Good Faith and Fair Dealing]

167. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-166 above, and further alleges that the activities of Defendants constitute a breach of the implied covenant of good faith and fair dealing in Plaintiff's Oral Agreements with Defendants and, alternatively (if any of the written agreements with Defendants are valid or enforceable), and in Plaintiff's written agreements with Defendants.

168. Each of the agreements between any of the Defendants and the Plaintiff contained an implied covenant that the Defendant would act under the agreement in good faith and fair dealing with respect to the Plaintiff.

169.  The activities of each of the Defendants described above, and particularly in ¶¶ 22-23, 43-48, 63-84, 118-123 and 150-161, were not performed by the Defendant in good faith and constituted unfair dealing with the Plaintiff.

170.  The Plaintiff was injured by reason of the activities of each of the Defendants in an amount not known at this time, but which will be proven with certainty at the time of trial.

171.  The Plaintiff is entitled to punitive damages, a preliminary injunction, and a permanent injunction prohibiting the Dillons Show from being broadcast within 100 miles of Fox's broadcast studios in New York, New York and London, England.

## COUNT X

**[Declaratory Judgment as to Unenforceability of Written Agreements and Releases: Fraud and Misrepresentation; Against Public Policy; Illusory; Lack of Consideration; Failure of Consideration]**

172.  Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-171 above, and further alleges that by reason of the activities of Defendants the Written Agreements and Releases between any of the Defendants and Plaintiff and/or Dillons (or Dillons' owner) are void and unenforceable for each of the following reasons: (i) fraud and misrepresentation in the inducement of Plaintiff and Dillons to participate in Ramsay's Kitchen Nightmares Series and to enter into each of the Written Agreements and Written Releases between Plaintiff and/or Dillons and any

of the Defendants; (ii) against public policy; (iii) illusory contract; (iv) lack of consideration; and (v) failure of consideration.

173. Ramsay, Upper Ground, Granada, Smith and Entertainment made the following representations of fact to the Plaintiff (the "Representations of Fact") before Plaintiff (on behalf of himself and and Dillons) executed the Defendants' 7-page agreement form entitled "Kitchen Nightmares  Personal Release":

A. Defendants intended to improve Dillons' business through the 1-week makeover;

B. Ramsay and his production staff did not intend to fire any of Dillons' employees during the 1-week makeover;

C. Ramsay and his production staff did not intend to terminate Dillons' cabaret-theatre business as part of his makeover of Dillons;

D. No one will lose his/her job at Dillons during the 1-week makeover by reason of any of Defendants' activities;

E. Defendants intended to help, not to hurt, the Dillons business;

F. Defendants had some big, pleasant surprises that they were going to reveal during the 1-week production that would be of substantial benefit to Dillons' business;

G.  Impliedly that the Defendants did not intend to create any negative or adverse conditions at Dillons for the sake of making the Dillons Show more exciting to viewers than the show would be otherwise;

H.  Impliedly, that the Defendants did not intend to falsely blame any owner, managers or employees of Dillons for conditions uncovered or created by Defendants;

I.  Impliedly, that Ramsay did not intend to commit an assault on the Plaintiff or any of the other managers or employees of Dillons; and

J.  Impliedly, that Ramsay and the other Defendants would not illegally and unjustifiably libel, slander or defame Plaintiff or any of the other managers or employees of Dillons.

175.  Each of the Representations of Fact was material to the Plaintiff and to Dillons.

176.  Each of the Representations of Fact was materially false when made.

177.  Each of the Defendants knew at the time they made the Representations of Fact that each of the representations was false, and material to the Plaintiff and Dillons.

178.  Plaintiff, on behalf of himself and Dillons, justifiably and reasonably relied on each of the Representations of Fact.

179. Each of the Representations of Fact was made by each of the Defendants, with scienter, intending to deceive and defraud the Plaintiff and Dillons.

180. Plaintiff and Dillons were injured by each of the Representations of Fact.

181. Plaintiff and Dillons relied reasonably upon the Representations of Fact by executing and delivering to Defendants a document containing the wording in Exhibit A hereto (document entitled "Kitchen Nightmares Personal Release"). Hereinafter the two documents are referred to respectively as the "Hyde Agreement" and the "Dillons Agreement").

182. The Hyde Agreement and the Dillons Agreement were induced and obtained through the above-described fraud and misrepresentation of the Defendants.

183. The Hyde Agreement and the Dillons Agreement are void or voidable and have no effect. Plaintiff hereby declares the Hyde Agreement void or avoided.

184. The Hyde Agreement and the Dillons Agreement, attempting to permit Defendants to do anything to injure Hyde and/or Dillons without any limitation, are void and unenforceable as against public policy.

185. Plaintiff is entitled to a declaration that the Hyde Agreement, Hyde Release and Dillons Agreement are null and void as against public policy.

186.  Plaintiff is also entitled to a declaration that the Dillons Agreement and Hyde Release are void and unenforceable as to the Plaintiff by reason of fraud and misrepresentation, as illusory contracts, for lack of consideration, and for failure of consideration.

187.  The Plaintiff is entitled to an award of attorneys' fees.

188.  Ramsay and the other Defendants have acted willfully, and maliciously, with near criminal indifference to their civil obligations under New York law, for the purpose of injuring the Plaintiff, Dillons, other Dillons' employees, and to willfully deceive many tens of millions of anticipated viewers of Defendants' Ramsay's Kitchen Nightmares Series in the United States, Australia and other English-speaking countries.

189.  The Plaintiff is entitled to an award of punitive damages against each of the Defendants in the amount of $3,000,000 or more, to be determined by the trier of fact.

## PRAYER

**WHEREFORE**, the Plaintiff demands judgment against each of the Defendants, as follows:

1.   As to Count I, that it be adjudged and decreed that the activities of Defendants constitute a breach of oral contract with the Plaintiff and breach of an oral contract with Dillons of which Plaintiff is a third-party beneficiary;

2.   As to Count II, that it be adjudged and decreed that the activities of Defendants constitute actionable unjust enrichment;

3.   As to Count III, that it be adjudged and decreed that the activities of Defendants constitute an unlawful inducement by Defendants of Dillons to breach its contract with Plaintiff;

4.   As to Count IV, that it be adjudged and decreed that the activities of Defendants constitute an unlawful interference by Defendants with Plaintiff's advantageous business relationship with Dillons;

5.   As to Count V, that it be adjudged and decreed that the activities of Defendants constitute an unlawful assault by Ramsay, which has been ratified by the other Defendants;

6.   As to Count VI, that it be adjudged and decreed that the activities of Defendants constitute a violation of § 349 of the New York General Business Law as deceptive acts and practices in the conduct of Defendants' business in New York;

7.   As to Count VII, that it be adjudged and decreed that the activities of Defendants constitute a violation of §§ 350 and 350-e of the New York General Business Law, as false advertising and bait and switch advertising;

8.    As to Count VIII, that it be adjudged and decreed that the activities of Defendants constitute actionable libel and slander of the Plaintiff by each of the Defendants;

9.    As to Count IX, that it be adjudged and decreed that the activities of Defendants constitute a breach of the implied covenant of good faith and fair dealing inhere in each of the agreements and releases between Plaintiff and each of the Defendants.

10.    As to Count X, that it be adjudged and decreed that by reason of the activities of Defendants the Plaintiff is entitled to a declaratory judgment that the Hyde Agreement, Hyde Release and the Dillons Agreement are null and void and unforceable for each of the following reasons: fraud and misrepresentation; against public policy, illusory contract, lack of consideration, and failure of consideration.

11.    Awarding damages against each of the Defendants in favor of the Plaintiff, in an amount not presently known, but to be proved with certainty at the time of trial;

12.    Awarding trebled damages to the Plaintiff as to each of Counts I through V and VIII through X, and treble damages (with limitations) as to Counts VI and VII).

13.    Awarding attorneys' fees to the Plaintiff as to each of Counts I through X;

14.   Preliminarily and permanently enjoining Defendants from broadcasting the Dillons Show containing any of the Defamatory Statements within 100 miles from Fox's broadcasting studios in New York, New York and London, England;

15.   Assessing pre-judgment and post-judgment interest against each of the Defendants, costs and disbursements; and

16.   Granting the Plaintiff such other and further relief as this Court may deem just and proper.

## Jury Demand

Plaintiff hereby demands a trial by jury of all issues properly triable to a

jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**Dated:  New York, New York**
**June 19, 2007**

**Carl E. Person   (CP  7637)**
**Attorney for the Plaintiff, Martin R. Hyde**
**325 W. 45th Street - Suite 201**
**New York, New York 10036-3803**
**(212) 307-4444**

# Exhibit A

## KITCHEN NIGHTMARES – PERSONAL RELEASE

Dated _____

Subject to the conditions precedent set out below, the following constitutes the agreement between Upper Ground Enterprises, Inc. ("Upper Ground"), of 15303 Ventura Boulevard, Building C, Suite 800, Sherman Oaks, California 91403 and _____ ("Participant" or "You/Your"), [address]_____, with respect to your proposed participation in one or more episodes of the television series being produced by Upper Ground presently entitled "Kitchen Nightmares" (the "Series") and intended for initial exhibition on Fox Broadcasting Company (the "Network").

### Conditions Precedent

Except as otherwise provided for in this Agreement, Upper Ground's obligations hereunder are expressly conditioned upon: (i) approval by Upper Ground and the Network's risk management department of your eligibility for the show, which approval shall be at the sole discretion of Upper Ground and the Network and the decision of which shall be given to Participant in writing and (ii) the receipt by Upper Ground of this Agreement fully executed by you.

1. **Participation:**

    (a) You understand that the Series involves a restaurant evaluation by one or more individuals (individually and collectively, the "Hosts") selected by Upper Ground, including, the UK chef Gordon Ramsay. The Hosts will make recommendations for changes to the restaurant and activities for the participants intended to improve one or more aspects of the restaurant. Upper Ground will then implement certain physical improvements and activities to the restaurant as Upper Ground may elect in its sole discretion. The changes and activities may be based in whole or in part on the evaluations and recommendations of the Hosts. The process, including but not limited to, the evaluation, implementation and follow-up (as defined in paragraph 4 below), shall hereinafter be known as the "Restaurant Transformation" and is anticipated to take up to 7 days in total.

    (b) Selection of participants shall be made by Upper Ground based on such criteria as Upper Ground shall determine in its sole discretion, which may be subjective. Upper Ground is not obligated to select you, even if you meet all eligibility requirements and all criteria of selection. Upper Ground's decision regarding the selection of participants is final, binding and not subject to challenge or appeal. If you are selected, Upper Ground is not obligated to have you appear on the Series, and Upper Ground shall have the right at all times and in its sole discretion to remove or replace you in connection with the Series for any reason or no reason.

    (c) You acknowledge that your appearance on the Series is not employment, is not a performance, is not subject to any union or guild collective bargaining agreement, and does not entitle you to wages, salary, corporate benefits, workers' compensation benefits, or other compensation or consideration under any collective bargaining agreement or otherwise.

    (d) You understand and agree that you are prohibited from wearing any apparel in the Series that contains any recognizable logos or trademarks, unless such apparel has been specifically provided to you, or approved in advance, by Upper Ground, or unless such apparel contains logos or trademarks of the restaurant in use as of the date of this Agreement.

2. **Full Cooperation; Evaluation Process:**

    (a) If you are selected by Upper Ground to be a participant in the Series, you shall cooperate fully with Upper Ground and shall follow all of Upper Ground's directions and instructions in all matters relating to the production of the Series, including, without limitation, the Restaurant Transformation. You further agree to be available and to participate as and where Upper Ground or the Network may require in connection with publicity, interviews and similar matters (e.g. to appear on news shows, talk shows and other programs, and to make appearances as required by Upper Ground or the Network) in connection with the Series as and when designated by Upper Ground or the Network in its sole discretion (whether before, during or after production of the Series.) You

acknowledge that Upper Ground's decisions on all matters relating to the Restaurant Transformation shall be final and binding on you in all respects. Participant shall cooperate with Upper Ground. the Hosts and any individual(s) designated by Upper Ground in connection with the Restaurant Transformation.

(b)     Participant understands that if you are selected to participate in the Series. you, your actions. voice and sound effects during the Series will be filmed and recorded on an up to 24 hours a day. seven days a week basis. including without limitation by means of hidden cameras and microphones and you hereby consent to such videotaping. filming or recording and knowingly and voluntarily waive any privacy rights you may have, regardless of whether you are aware the recording of your actions and conversations is taking place. You hereby waive any and all claims, whether related to defamation. invasion of privacy or otherwise, in connection with any such hidden camera recording and use of any recordings, including hidden camera recordings, (whether recorded by videotape. film or otherwise) as part of the Photography (as hereafter defined).

(c)     You agree to be available for on-camera interviews and "video diaries" as needed.

(d)     You acknowledge and agree that you may be chosen as an alternate (as opposed to a participant) by Upper Ground in its sole discretion. If you are chosen as an alternate. you shall remain available to participate in the Series if and when chosen by Upper Ground to replace a participant. You understand that if you are selected to be an alternate and not chosen to replace a participant, then no consideration shall be payable to you. You agree that all the terms and conditions of this Agreement shall apply to you with full force and effect whether you are initially selected as an alternate or a participant and whether or not you are ultimately selected as a Participant or to replace a Participant.

3.     **Restaurant Transformation:** You shall participate directly in the Series activities in whatever capacity Upper Ground may reasonably request and shall follow Upper Ground's directions and instructions in all respects with respect to the Series. It is anticipated that the Restaurant Transformation process will take up to seven (7) consecutive days and may involve up to sixteen (16) hours per day.

4.     **Follow-Up:** Upper Ground may conduct follow-up interviews and/or taping on one (1) day during the approximately three (3) to six (6) month period following the Restaurant Transformation, to be determined by Upper Ground in its sole discretion. in consultation with Participant. Participant shall be available for and shall participate in any follow-up evaluations. as well as any publicity. interviews and/or other promotional and publicity activities that Upper Ground may reasonably request following production of the applicable episode(s) of the Series (collectively "Follow-Up"). Upper Ground reserves the right to conduct multiple follow-up interviews and/or tapings, subject to consultation with Participant regarding the date(s) and time(s).

5.     **Series Activities; Assumption of Risk:**

(a)     You understand that participation in the Series may involve physical and potentially hazardous activities, such as (but not limited to) cooking in a hectic kitchen environment, moving items (e.g.. food, stock or displays), or physical repairs and improvements to the Location. You represent that you are in good health, and are physically capable of performing any and all Series activities that Upper Ground may request, unless you specifically notify Upper Ground in writing to the contrary prior to undertaking or participating in any proposed Series activity(ies) of any physical or other condition that might affect you or any other people involved in the production of the Series.

(b)     You accept and assume all risks of participating in the Series. and you knowingly, voluntarily and freely accept any risks, hazards and dangers that you may encounter or be exposed to in connection with your activities in connection with the Series which may expose you and other participants to a variety of unmarked and uncontrolled hazards and conditions that may cause Participant serious bodily injury. illness or death, including but not limited to, operating dangerous kitchen equipment; falling objects: collisions with objects. other participants, spectators and others; injuries arising from equipment failure or defect; exhaustion; dehydration: fatigue: over-exertion; and any and all risks arising from working in a hectic restaurant environment and in connection with the use of any materials or equipment provided by Upper Ground. You hereby waive any claim against Upper Ground and the Network, their parents. subsidiaries. affiliates and their licensees and assigns. as well as their respective employees. independent contractors, invitees, agents and/or representatives, related to any damages or injuries that may be incurred or suffered as a result of or in connection with your actions. activities and participation hereunder.

In case of an emergency, you authorize Upper Ground to arrange for or provide such medical assistance as it determines necessary.

    (c)    You understand that, in and in connection with the Series, you may reveal and/or relate, and other parties may reveal and/or relate, information about the restaurant or you of a personal, surprising, defamatory, disparaging, embarrassing or unfavorable nature. Participant further understands that your appearance, depiction, and/or portrayal of you in and in connection with the Series and your actions and of others displayed in and in connection with the Series, may be disparaging, defamatory, embarrassing or of an otherwise unfavorable nature, may expose you to public ridicule, humiliation or condemnation, and may portray you in a false light.

    (d)    You hereby waive any claims related to any of the foregoing set forth in this paragraph, and expressly acknowledge and agree that Upper Ground, the Network, and any television station or channel, cable network, or satellite network that airs the Series shall have the right (but not the obligation) (a) to include any such information and any such appearance, depiction, portrayal, actions and statements in the Series as edited by Upper Ground in its sole discretion and otherwise, and in any and all forms of advertising, promotion, and publicity for the Series, for Upper Ground, for the Network, for any other production, and for any television station or channel, cable network, or satellite network that may air the Series in any and all media, now known or hereafter devised, in perpetuity, throughout the world.

6.    **No Obligation to Produce or Broadcast:** Participant understands and acknowledges that the commencement of production, the production, and the completion of production of one or more episodes of the Series may be delayed, suspended, terminated or abandoned by Upper Ground at any time in its sole discretion and for any reason whatsoever, including due to events beyond Upper Ground's control. In the event of any such delay, suspension, termination or abandonment, Upper Ground shall have no obligation to you whatsoever. The waivers, releases, and indemnities set forth in this Agreement and any other agreement that you may execute in connection with the Series expressly apply to any such delay, suspension, termination, or abandonment of production of the Series. Even if production of the applicable episode(s) is/are completed, Upper Ground is not obligated to broadcast, license or otherwise use or exploit the Series or any part thereof, or to continue any exploitation of the Series, or to make any actual use of any Photography.

7.    **Rights:** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, you irrevocably grant to Upper Ground the right (a) to interview you as many times and for such periods of time as Upper Ground requests in its sole discretion, and to videotape, film and otherwise record such interview(s) and your statements and appearances therein, including your name, voice and likeness, and (b) if you are selected by Upper Ground to be a participant in the Series, to videotape, film, portray, photograph and otherwise record you and your actions and voice and other sound effects in connection with the Series. Any such interview(s), any and all information you have supplied or may supply in such interview(s), in the Application or otherwise (including biographical information, photographs and videotapes of you and/or others, and any other materials), any and all other information Upper Ground has received or will receive from other sources, your appearance, actions, voice and sound effects in connection with the Series (including vocal, instrumental and musical sound effects and compositions of any kind or nature), and the results and proceeds of your participation in the Series, and reproductions or recordings of any nature of any of the foregoing, in whole or in part, shall be referred to as "Photography". Upper Ground shall be the sole and exclusive owner of all rights of every kind in and to the Photography and the results and proceeds of your services hereunder and the rights granted by you hereunder, in and in connection with the Series and otherwise, including, without limitation, the production, distribution, exhibition, advertising, publicizing, merchandising, by-products, ancillary rights, commercial tie-ins or other exploitation of the Series and otherwise, in whole or in part, throughout the universe, in any manner, by any method, and in any and all media, whether currently existing or hereafter developed (including, without limitation, the Internet), in perpetuity, all without further obligation or compensation to you. You acknowledge that all results and proceeds of your services shall be deemed a "work-made-for-hire" for Upper Ground and, therefore, Upper Ground shall be the author and copyright owner thereof. Any Series produced or developed hereunder shall be registered for copyright in the name of Upper Ground or its designee as the owner and author thereof. You waive the exercise of any "moral rights" and "droit moral" and any analogous rights however denominated in any jurisdiction of the world. Upper Ground will own any so called "rental and lending rights" or similar rights. Upper Ground shall have the right to edit, rearrange or use any portion of the Series, alone or with other material. In and to the extent that any or all of the provisions of this paragraph do not operate to vest fully and effectively in Upper Ground all or any of the rights set forth herein, you

hereby grants and assigns to Upper Ground all rights not so vested (and so far as may be appropriate by way of immediate assignment of future copyright) throughout the universe in perpetuity in any and all media, whether now or hereafter known or created. Without in any way limiting the above, you acknowledge and agree that the Network shall have the right to use the Photography, any part or element of the Photography, your name, sobriquet, likeness, photograph, caricature, voice and biographical material in and in connection with advertisements, promotions and publicity for the Series, for the Network and for stations and other persons and entities broadcasting or otherwise exhibiting the Series.

8.      **Participant's Representations and Warranties:** You represent and warrant that: (a) you are not a minor and have the full right and authority to enter into this Agreement and to grant the rights granted with respect to you; (b) your appearance, as well as any statements made by or materials provided by you, and the use of the Property in the Photography and the Series will not infringe or violate the right whatsoever of any person or entity; (d) all of the information that you have provided is true, accurate, and complete. You further warrant and represent that you are not and will not be a regular contributor to the media and will not be part of or contribute to a media story that may bring the Series, Upper Ground, the Network, or any of their respective subsidiaries, parents, affiliated companies, employees, agents or otherwise, into disrepute. You represent and warrant that you are not a member of any performing arts union or guild.

9.      **Releases and Indemnifications:**

        (a)     You, on behalf of yourself, and any heirs, spouses, executors, next of kin or successors-in-interest ("Releasing Parties"), hereby indemnify and hold harmless Upper Ground, the Network and any other licensees or assignees, and their respective employees, affiliates, directors, officers, agents, contractors, representatives and each of them ("Released Parties"), from and against any claims relating to any breach or alleged breach of your representations, warranties, covenants, obligations and undertakings pursuant to the terms and conditions of this Agreement, as well as any claims relating to your participation in the Series and any use of any statements, appearances, materials and/or information provided to Upper Ground in connection with the activities set forth in this Agreement.

        (b)     To the maximum extent permitted by law, you and the Releasing Parties hereby irrevocably agree not to sue or assert any claims against Upper Ground or any of the Released Parties in connection with any of the activities related to the production of the Series hereunder with respect to any injuries, emotional distress, business losses or other damages, losses, or harm to you or any of the Releasing Parties relating to or arising from any such activities.

        (c)     To the maximum extent permitted by law, you and the Releasing Parties hereby waive any claims or damages (including, without limitation, reasonable attorneys' fees) arising out of or resulting from your participation in the Series, any exploitation of the Series or your appearance and participation therein, or the exercise by Upper Ground or its licensees and designees of any rights granted pursuant to this Agreement on any legal theory whatsoever, including, without limitation, fraud, intentional or negligent misrepresentation, personal injury, death, rights of privacy and publicity, false light, defamation, intentional or negligent infliction of emotional distress, product liability, breach of contract, breach of any statutory or other duty of care owed under applicable laws, infringement of copyright, loss of earnings or potential earnings. The foregoing released claims specifically include any claims related to any defect in or failure of equipment, warnings or instructions.

        (d)     You and the other Releasing Parties acknowledge that, subsequent to the execution of this agreement, (a) the facts and perceived circumstances to which this release relates may turn out to be other than or different from the facts and perceived circumstances now known or believed to be known by me and/or (b) you or the other Releasing Parties will discover facts or incur or suffer claims which were unknown or unsuspected at the time this agreement was executed, and which if known by you or them at that time may have materially affected your or their decision to execute this agreement. You and the other Releasing Parties acknowledge and agree that by reason of this agreement, and the release contained in the preceding paragraphs, you and the other Releasing Parties are assuming any risk of (x) any such facts and perceived circumstances turning out to be different and (y) any such unknown facts and such unknown and unsuspected claims. You and the other Releasing Parties acknowledge and agree that the release contained herein shall be in all respects effective and not subject to termination or rescission by reason of such different facts, different perceived circumstances, unknown facts and/or unknown and/or

unsuspected claims. You and the other Releasing Parties have been advised of the existence of Section 1542 of the California Civil Code, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Notwithstanding such provisions, this release shall constitute a full release in accordance with its terms. To the maximum extent permitted by law, you and the other Releasing Parties knowingly and voluntarily waive the provisions of Section 1542, as well as any other statute, law, or rule of similar effect of any jurisdiction throughout the world, and acknowledge and agree that this waiver is an essential and material term of this release and the settlement which leads to it, and without such waiver the settlement would not have been accepted. You and the other Releasing Parties hereby represent that you and they have been advised by their legal counsel, understand and acknowledge the significance and consequence of this release and of this specific waiver of Section 1542 and other such laws.

(e)  I agree to defend, indemnify and hold harmless the Released Parties, from any and all liabilities, claims, actions, damages, expenses, losses, and costs of any kind (including, without limitation, attorneys' fees) caused by or arising out of my participation as a contestant on the Series, including, without limitation, any of the following:  (a) any statement or action made or taken by me or anyone else during or in connection with my participation on the Series; (b) my failure to follow the advice or instructions of Producer, any of their officers, agents, representatives or employees, or anyone connected with the Series; or (c) my breach of this Agreement and Release.

10.     Publicity; Confidentiality:  Except as specifically authorized by Upper Ground, you will not advertise or promote, or authorize others to advertise or promote, your participation in the Series, or receive or generate any monetary advantage from your participation in the Series apart from any consideration hereunder. You shall consult with Upper Ground regarding any and all publicity (including, but not limited to, television, radio, Internet and print interviews) in connection with your involvement and/or appearance on the Series and shall not consent to any publicity without the prior approval of Upper Ground. Notwithstanding the foregoing, you may refer to the fact of your participation in the Series in personal publicity relating to yourself, provided that any such publicity takes place after the initial broadcast of the applicable episode(s) of the Series relating to you. You agree to keep in strictest confidence and to not use or disclose to any party any information or trade secrets obtained or learned as a result of participation in the Series, including, without limitation, any information concerning or relating to the Series, the events contained in the Series. Upper Ground's production activities relating to the Series or the outcome of the Restaurant Transformation that you read, hear or otherwise acquire or learn in connection with or as a result of your participation in the Series (collectively, the "Confidential Information and Materials"). In addition, you agree that you will not make copies of, or record, any Confidential Information and Materials in any manner whatsoever. The Confidential Information and Materials shall not be used by you other than for the sole purpose of your involvement in the Series and you shall be fully responsible for any unauthorized disclosure by you of the Confidential Information and Materials.

11.     No Plugola/Payola:  You shall not mention or "plug" any commercial product or service on the Series unless expressly authorized to do so by Upper Ground. Other than any consideration hereunder, you have not paid or accepted, and will not pay or accept, any money or other valuable consideration in connection with your appearance on the Series, or authorized anyone else to do so.  You are aware that payment or acceptance of, or agreement to pay or accept, any money or valuable consideration for the appearance of any person or the mention of anything on the Series without disclosure to the broadcaster prior to broadcast is a federal offense punishable by fine and imprisonment.  You agree to notify Upper Ground promptly if anyone tries to induce you to accept any such payment or consideration.

12.     Merchandise/Endorsement:  You shall not be entitled to use any name(s), trademark(s), logo(s), photograph(s), tape or other recording(s) related to the Series, Upper Ground or the Network in connection with (a) any merchandise, (b) any video, book or magazine, or (c) any endorsement of the restaurant or any product or service, without Upper Ground's prior written consent in each instance. Upper Ground  shall be entitled to use any rights acquired hereunder in connection with publicity, endorsements and/or merchandise relating primarily to the Series, all without any payment or consideration to Participant or any person or party related to Participant and/or

the Business and/or the production and related activities hereunder.

13.   **Governing Law:** This Agreement and any disputes relating to this Agreement shall be governed by, construed and performed in all respects in accordance with the laws of the State of [New York][California] without regard to conflicts of law rules. Participant and Upper Ground agree that all disputes regarding this Agreement shall be resolved by binding arbitration conducted in the County of [New York][California], and administered by JAMS in accordance with the commercial arbitration rules of JAMS (the "JAMS Rules"). The JAMS Rules for selection of an arbitrator shall be followed, except that the arbitrator shall be an experienced arbitrator licensed to practice law in [New York][California].

14.   **Remedies:** You hereby waive any right to seek rescission, injunction or other equitable relief as well as any right to seek punitive damages and acknowledges that your sole remedy for any claim relating to this Agreement will be an action at law for actual monetary damages, if any. You hereby waive any right to seek consequential damages. You recognize that a breach by you of this Agreement would cause Upper Ground irreparable injury and damage that cannot be reasonably or adequately compensated by damages in an action at law and, therefore, you hereby expressly agrees that Upper Ground shall be entitled to injunctive and other equitable relief, with respect to any breach or threatened breach of this Agreement by Participant.

15.   **Miscellaneous:** Upper Ground may assign this Agreement or any portion thereof and any rights acquired hereunder to any person or entity.  You may not assign this Agreement or any portion thereof without Upper Ground's prior written consent, in its sole discretion, and any purported assignment in violation of the foregoing shall be of null and void from the making thereof. This Agreement constitute the entire agreement between you and Upper Ground concerning the subject matter hereof and supersede all prior negotiations, understandings and agreements (whether oral or written) and may may not be altered except by another written agreement signed by both parties. No failure to exercise or delay in exercising any right or remedy hereunder in a particular instance shall operate as a waiver thereof or of any other right or remedy hereunder, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.  No waiver of any term, provision or condition of this Agreement shall be effective unless expressly stated in writing signed by the waiving party.  The invalidity or unenforceability of any part of this Agreement shall in no way affect the validity or enforceability of any other part thereof. All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be in addition to and shall not limit any other remedy, right, undertaking, obligation, or agreement of any party. The headings of this Agreement and Release are merely for convenience and shall have no legal effect or significance.

16.   **Knowledge and Understanding of the Agreement:** YOU HAVE BEEN GIVEN AMPLE OPPORTUNITY TO READ, AND HAVE CAREFULLY READ, THIS ENTIRE AGREEMENT (INCLUDING, WITHOUT LIMITATION, THE PERSONAL RELEASE ATTACHED HERETO).  ACCORDINGLY, NO PRESUMPTION FOR OR AGAINST UPPER GROUND OR YOU ARISING OUT OF THE DRAFTING OF ALL OR ANY PART OF THIS AGREEMENT WILL APPLY OR WILL BE APPLIED IN ANY LEGAL PROCEEDING RELATING TO OR INVOLVING THIS AGREEMENT. YOU DECLARE THAT PARTICIPANT FULLY UNDERSTANDS THE CONTENTS, MEANING PURPOSE AND EFFECTS OF THIS AGREEMENT, AND THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT RELATING TO YOUR RIGHTS, RESPONSIBILITIES AND PARTICIPATION IN THE SERIES, AND WAIVING LEGAL RIGHTS YOU MAY HAVE AGAINST UPPER GROUND, THE NETWORK, BROADCASTERS, SPONSORS OF THE SERIES AND OTHERS. YOU HAVE HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL AND OTHER ADVISORS OF YOUR CHOICE PRIOR TO SIGNING THIS AGREEMENT, AND HAVE DONE SO OR HAVE KNOWINGLY WAIVED YOUR RIGHT TO DO SO.

AGREED TO AND ACCEPTED:

[Name of Participant]                          UPPER GROUND ENTERPRISES, INC.


By: _____          By: _____

Its: _____          Its: _____


Social Security
or Federal Tax ID No.: _____


Date: _____


I warrant that I am the parent or legal guardian of the minor signing this Personal Release. I consent to the execution of this Personal Release by my child, and I hereby join in the grant of rights, representations and warranties on behalf of myself and my child, subject to the foregoing terms and conditions. I hereby indemnify Producer and its licensees and assigns from any breach by myself or my child of any agreement, representation or warranty in this Release.


_____          Date: _____
Signature


_____
Print Name


Address: _____          Phone: _____

_____

# Exhibit B

## APPLICATION RELEASE

I hereby acknowledge that I have read and I meet the eligibility requirements. I hereby certify that all statements made in this application are true and complete. I understand that if any of the disclosures made by me on this application are false, this will be cause for disqualification of my consideration for this production.

I further acknowledge and accept that this application form and any other materials (including, but not limited to, photographs, and videotapes) I have submitted or will submit to Upper Ground Enterprises, Inc. and A. Smith & Co., will become the sole and exclusive property of Upper Ground Enterprises, Inc. and A. Smith & Co. and will not be returned to me. I understand that as the owners of this material Upper Ground Enterprises, Inc. and A. Smith & Co. shall have the right to edit, distribute and exploit the material submitted in any manner in their sole discretion but shall have no obligation to do so. By signing below, I grant to Upper Ground Enterprises, Inc. and A. Smith & Co. the right to use any biographical information contained in this application, my home video or taped interview, and to record, use, and publicize my home videotape or taped interview, voice, actions, likeness and appearance in any manner in connection with this production.

I hereby release and indemnify Upper Ground Enterprises, Inc., A. Smith & Co. and Fox Broadcasting Company and all of their respective licensees, assigns, successors, parents, affiliated and subsidiary companies, divisions, and joint ventures as well as their employees, officers, directors and agents (collectively, the "Released Parties") from any and all claims or demands of every kind that I or any third party may now or hereafter have against the Released Parties in connection with my application to appear in the production and the exploitation of any and all materials I have submitted in connection therewith, or any exercise by any or all of the Released Parties of any of the rights I am granting hereunder, or any other matter contained herein, including, but not limited to, any claims for defamation, violation of rights of privacy and/or publicity, negligence, and/or intentional infliction of emotional distress.

Date: _____

Signature: _____

Print Name: _____

Kitchen Nightmares – CASTING APPLICATION v2 Page 12 of 12

# Exhibit C

## May 2007 Article from Restaurant-Hospitality.com

## [Source: www.restaurant-hospitality.com/article/17089/]

### READY FOR YOUR CLOSEUP?

**Would you be interested in working with one of the world's top chef/restaurateurs to turn your struggling full-service restaurant business around, for free? Hey, who wouldn't? Would you be as amenable if it means having culinary bad boy Gordon Ramsay and his Kitchen Nightmares TV reality show production crew take over your place for a week to film the entire process? If so, the time to strike is now, because the FOX network has put out an urgent casting call for restaurant owners who want to take part.**

\* \* \*

*Kitchen Nightmares*, on the other hand, is a real-deal restaurant show-front of the house, back of the house, the bottom line, the works. And while it's unscripted, the restaurants and their problems are all too real.

The show, set to debut in September in prime time, has a simple premise. The owners of a failing restaurant agree to let Ramsay come in for one week and do whatever it takes to transform their place into a winner. Anything short of a physical location change can and will be attempted, the beauty part being that the makeover will be overseen by a three-star Michelin chef who runs successful restaurants all over the world. Say what you will about Ramsay's maniacal persona, you have to admit that the factors he's most maniacal about-consistent perfection of food and service-are ultimately what matters in the restaurant business.

But maniacal three-star Michelin chef or not, can Ramsay really resuscitate somebody else's failing restaurant, and do so on a weekly basis? His track record suggests that, for the most part, he can. Ramsay has proven successful in turning around a variety of on-the-brink restaurants in the 14 episodes of *Kitchen Nightmares* that have been shown in the British version of this series, now into its third season. Ramsay is still his wild and crazy self on these shows, but at least you can tell he's on the side of the restaurant operator having the problem. **Yes, there will still be F-bombs galore, but at least Ramsay won't be trying to kick the operator off the show a la *Hell's Kitchen.***

**What makes this a rare opportunity for operators is that Ramsay isn't really available to consult at any price, but his services are free to the restaurant owners whose operations are chosen to appear on *Kitchen Nightmares.***

**Of course, you'll have to sign a few papers before Ramsay and crew show up to keep your restaurant from going under. Actually, a lot of papers, judging from the 17-page casting application you can download at www.theconlincompany.com/casting.html.** The show wants to know everything about you, but it looks like **you might be out if you've ever** "been arrested, detained or convicted of a felony or misdemeanor offense either as a juvenile or as an adult," are **"involved in any past and/or pending litigation,"** have "ever had a restraining order placed against you" or "are a member of any professional performing arts union (SAG, AFTRA, AGMA, AEA, etc.)." If you're running for office, or plan to, or have been on other reality or game shows recently, they don't want you on this one.

Other lines of inquiry include "have you ever been treated for any serious physical or mental illness within the last five years" and "have you ever been treated for depression?" They also want to know how much alcohol you drink, if you're an alcoholic or are addicted to drugs. are in a 12-step program or are taking any medications.

It sounds like the producers are looking for straight arrows. but the opposite might be true. *Kitchen Nightmares* will debut this September in a high-profile time slot: 9 p. m. on Thursdays. The hour-long show will be going against top-rated shows-*CSI* from CBS and ABC's *Grey's Anatomy*. Both are dramas, **and Kitchen Nightmares will have to provide plenty of fireworks if it's going to gain an audience.**

**So it's up to you. Are you willing to have your restaurant, and all its flaws, exposed on prime time national TV? Do you believe that Ramsay can bring your restaurant back from the dead in just a week? (You can buy a DVD, *Ramsay's Kitchen Nightmares Revisited*, that shows how he did it on his British TV series and how the restaurants fared after he left.)**

**We say that if your place is struggling, why not take a chance? The publicity alone will probably draw in enough curious customers that you'll boost revenues for months no matter how well Ramsay's makeover turns out. And if he does come up with a winning food and service package for your place, your business will go wild. Unless you're publicity shy, what is the downside here?**

*Bob Krummert editor@restaurant-hospitality.com*

[Bold emphasis added.]

**Exhibit D**

**Advertisement in the Form of a Casting Notice for Ramsay's Kitchen Nightmares Series Published by The Conlin Company**

**[Source: www.theconlincompany.com/casting.html]**

**CASTING IMMEDIATELY FOR
KITCHEN NIGHTMARES!!
Airing Now on Fox Monday Nights at 9pm PST.**

# Kitchen Nightmares

## Gordon Ramsay's newest show is looking to help struggling restaurants turn their fortunes around!

Hell hath no fury like an angry chef, and no chef has a sharper temper than Gordon Ramsay when things go wrong in the kitchen. The star of the highly rated culinary boot camp HELL'S KITCHEN returns to FOX with another sizzling unscripted series, KITCHEN NIGHTMARES. This time, Chef Ramsay hits the road, in each episode tackling a restaurant in crisis and exposing the stressful realities of trying to run a successful food business. KITCHEN NIGHTMARES starts production in February, while the third season of HELL'S KITCHEN starts production later this month and will premiere on FOX this spring.

For restaurant owners in crisis with lazy chefs in the kitchen, temperamental wait staffs and few and unhappy diners, it's time to call in the restaurant industry's equivalent of 911.

Inspired by one of the UK's biggest hits, KITCHEN NIGHTMARES is seen in more than 50 territories around the globe, and the series reveals a whole new side to Ramsay. He's still prone to the explosive outbursts and spectacular confrontations familiar to fans of HELL'S KITCHEN, but he also shows his sensitive and nurturing side – a unique blend of fury, passion, inspirational leadership and tough love that can turn a small spark of talent into a roaring flame.

Feared and revered in equal measure, Ramsay has to galvanize owners, chefs and their kitchen brigades as he attempts to turn around the fortunes of each restaurant in just one week and save them from their living nightmares.

There's no time for polite small talk as Ramsay embarks on his mission to turn things around. If the wine waiter's service isn't up to par, he'll be out the door before he can say "merlot." If the head chef doesn't match up to Ramsay's expectations, Ramsay will hammer him into shape, and if he can't stand the heat, he may quit the kitchen.

Ramsay's reputation is on the line, so there's bound to be high blood pressure, raised voices and serious clashes as he attempts to do the impossible: turn a deserted dining room into the most sought-after venue in town in just a week.

KITCHEN NIGHTMARES is a co-production of Granada America and Optomen Television, in association with A. Smith & Co.  Executive producers are Arthur Smith, Pat Llewellyn, Kent Weed, Gerry McKean and Curt Northrup.

### Download a Casting Application by Clicking Here >>

Applications should be sent to:
The Conlin Company
11825 Major St. #106
Culver City, CA 90230

** Restaurants must have been open for over a year, must be honest about the problems they are facing and applicants must be over the age of 21 **

[Note: Add Ex. A]